# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") shall be effective as of the May 1, 2007, by and between **AEM, INC. dba MIRABILIS HR**, a Florida Corporation ("Seller"), located at 4035 W 1st Street, Sanford, Florida 32771; and **O2 HR, LLC**, an Illinois limited liability company (the "Buyer"), located at 5050 W. Lemon Street, Tampa, Florida 33609. Buyer and Seller are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## BACKGROUND RECITALS

A. Seller operates a services business that provides labor and human resource solutions, including without limitation, employee leasing services and payroll outsourcing services (hereinafter referred to as the "Business").

B. Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Seller, certain assets associated with the Business, as more fully described herein, pursuant to the terms and conditions of this Agreement.

C. Buyer acknowledges that Seller is in need of a significant cash infusion and that Seller may or may not be able to maintain itself as a going concern; Buyer shall use all payments made pursuant to the Note for the purposes of funding its customary business operations and paying its operating expenses.

D. Buyer and Seller acknowledge that this Agreement is conditioned on the Florida Department of Business and Professional Regulation's approval.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties hereto intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement, and unless defined elsewhere herein, the following terms shall have the following meanings:

"<u>Adverse Claim</u>" means an existing lien, security interest, pledge, or charge or other encumbrance of any kind, other than those created in favor of Buyer under this Agreement or the other documents contemplated hereby.

/s/ JB
Buyer

Purchase Agreement – AEM /O2 HR
Page 1 of 15


Seller


EXHIBIT 3

"Affiliate" shall mean, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.

"Applicable Laws" means all applicable laws, statutes, ordinances, rules, regulations, guidelines and orders of all Governmental Entities.

"Code" means the Internal Revenue Code of 1986, as amended.

"Client Service Agreement" means the contractual agreement between Seller and each of its client companies pursuant to which Seller and each client company maintain a co-employment relationship.

"EBITDA" means earnings (revenues less costs of sales and operating expenses) except for interest expenses, taxes, depreciation amortization, dividends or any distributions to members, and any extraordinary executive compensation, as determined utilizing GAAP by Buyer's independent auditors.

"Effective Date" shall mean the date first written above.

"GAAP" means United States generally accepted accounting principles (as expounded by the Financial Accounting Standards Board).

"Governmental Entity" shall mean any court, administrative agency or commission or other foreign, federal, state or local governmental authority or instrumentality.

"Material Adverse Effect" means a change in the operations, affairs, condition (financial or otherwise), results of operations, assets, Obligations, reserves or any other aspect of the Business that results in a material adverse change in the Business or Purchased Assets.

"Obligation" means any debt, liability or obligation of any nature, whether secured, unsecured, recourse, nonrecourse, liquidated, unliquidated, accrued, absolute, fixed, contingent, ascertained, unascertained, known, unknown or otherwise.

"Ordinary Course" means in the ordinary course of the Seller's business consistent with past practices.

"Permits" shall mean all licenses, permits, certificates, registrations, authorizations and approvals of any Governmental Entity.

"Person" means a natural person, corporation, partnership, sole proprietorship, joint venture, association, joint-stock company, trust, estate, unincorporated organization, government (and any branch or subdivision thereof), Governmental Entity, cooperative or other entity.



"Premises" shall mean any real property Seller owns or has owned, leases or has leased or otherwise occupies or uses or has occupied or used.

"Taxes" shall mean all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sect. 59A), excise, property, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"Tax Return" shall mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

# ARTICLE II
# ASSETS BEING SOLD

2.1 **Sale and Purchase of Assets**. Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to transfer, sell, convey, assign and deliver to Buyer, free and clear of all Adverse Claims, and Buyer agrees to purchase from Seller, all right, title and interest in and to Seller's Client Service Agreements, a complete and accurate list of which, as of the Effective Date, is attached hereto and incorporated herein as Exhibit 2.1. (collectively, the "Purchased Assets"). The Purchased Assets shall not include any of the following: (i) any rights of Seller under this Agreement (including any proceeds of this Agreement); (ii) Seller's accounts receivable; (ii) Seller's insurance policies (including but not limited to Seller's employee benefit plans and workers compensation polices); (iii) Seller's prepaid items and deposits (including but not limited to any and all workers compensation deposits; provided, however, that any customer deposits made pursuant to a Client Service Agreement shall be included in the Purchased Assets); (iv) Seller's income tax returns; (v) Seller's corporate and company minute books and stock ownership record books; (vi) all of Seller's personnel records and other records required by law to remain in Seller's possession (provided, however, that Buyer shall be provided copies of all such records at Buyer's expense); and (vii) all claims for refund of taxes and other governmental charges of whatever nature ("collectively, the Excluded Assets").

2.2 **Assumed Liabilities**. Buyer shall, at the Closing, assume, and indemnify and hold Seller harmless from, any and all liabilities associated with the Purchased Assets, which arise in the Ordinary Course on and after the Closing (collectively, the "Assumed Liabilities").

2.3 **Required Consents**. If an attempted assignment or transfer of any contracts, licenses, permits or any claim or right of any benefit arising hereunder or resulting herefrom, without the consent of a third party, would constitute a breach hereof or in any way adversely affect the rights of Seller or Buyer hereunder, unless and until any such required consent has been obtained and is in full


Buyer

Purchase Agreement – AEM /O2 HR
Page 3 of 15

force and effect such contract, license, permit or other right or benefit shall not be deemed assigned or transferred. To the extent that Buyer shall have determined to close under this Agreement prior to receipt of any consent necessary to transfer the rights and benefits of any Purchased Asset, then for six months following the Closing Date, the Parties hereto will cooperate to, and the Parties shall continue to use their best efforts to, obtain as promptly as practicable all such consents, approvals and waivers required by third parties to transfer to Buyer such Purchased Assets in a manner that will avoid any default, conflict, or termination of rights hereunder. Pending such transfer, the Parties shall use commercially reasonable efforts to provide the benefits of such Purchased Assets to Buyer in a manner that would as nearly as practicable reflect the purpose and intention of this Agreement.

## ARTICLE III
## PURCHASE PRICE

**3.1** **Purchase Price.** The aggregate purchase price for the Purchased Assets and Assumed Liabilities (the "Purchase Price") shall be **TWO MILLION TWO HUNDRED THIRTY FIVE THOUSAND AND EIGHT HUNDRED 00/100 DOLLARS** ($2,235,800.00) (the "Purchase Price"), and shall be payable to Seller over a Term of five (5) years commencing on June 1, 2007 (the "Payment Term"), as evidence by the terms and conditions of that certain Promissory Note, of even date herewith at the fixed rate of Two and Five Tenths Percent (2.5%) per annum. The Purchase Price shall be subject to adjustment as follows:

For a period of two (2) years, commencing on June 1, 2007, and ending on May 1, 2009, Buyer shall pay Eleven and 66/100 Dollars ($11.66) ($700.00 for each full-time worksite employee divided by 60 months) per active full-time worksite employee for whom Buyer processes payroll in any given month ("Full-Time Monthly Payment"). The Full-Time Monthly Payment shall be calculated on the first of each month following the Closing Date and the Full-Time Monthly Payment shall due and payable to Buyer not more than five (5) days thereafter.

For a period of two (2) years, commencing on June 1, 2007, and ending on May 1, 2009, Buyer shall pay Four and 16/100 Dollars ($4.16) ($250.00 for each part-time worksite employee divided by 60 months) per active part-time worksite employee for whom Buyer processes payroll in any given month ("Part-Time Monthly Payment"). The Part-Time Monthly Payment shall be calculated on the first of each month following the Closing Date and the Part-Time Monthly Payment shall due and payable to Seller not more than five (5) days thereafter.

No interest shall be due or shall accrue on the Note during the above two (2) year period for payments due for full-time employees or part-time employees.

Commencing on June 1, 2009 and ending on May 1, 2012 (the remaining three (3) years of the Payment Term), the Full-Time Monthly Payment shall become fixed as calculated

_/B_
Buyer

Purchase Agreement – AEM /O2 HR
Page 4 of 15

Seller

on June 1, 2009 (the "Fixed Full-Time Monthly Payment") and the Part-Time Monthly Payment shall become fixed as calculated on June 1, 2009 (the "Fixed Part-Time Monthly Payment"). On June 1, 2009, the Buyer and Seller shall conduct a census applying the terms set forth above to determine the Fixed Full-Time Monthly Payment and the Fixed Part-Time Monthly Payment, which shall be conclusive and shall not be subject to dispute by any Party at any time thereafter. Both the Fixed Full-Time Monthly Payment and the Fixed Part-Time Monthly Payment shall then be multiplied by 35 months to determine the remaining balance of the Purchase Price due by Buyer to Seller.

For purposes of this Section 3.1, "full-time worksite employee" shall be defined as a worksite employee who works thirty (30) hours or more in given work week for a company that executed a Client Service Agreement with Seller, and a "part-time worksite employee" shall be defined as a worksite employee who works less than thirty (30) hours in a given work week for a company that executed a Client Service Agreement with Seller.

3.2 **Payment of Purchase Price**. The Purchase Price shall be payable by Buyer as follows:

(a) The Buyer shall deliver to Seller on the Closing Date, a promissory note in the amount of the Purchase Price less any payments made (the "Note"). The full terms and conditions of such Note shall be substantially as set forth in the form attached hereto and incorporated herein as Exhibit 3.2.

3.3 **Security Interest**. As security for Buyer's payment of the Purchase Price, the shareholders of Buyer's parent company, Oxygen Unlimited, LLC ("Oxygen"), shall create and issue a preferred class of convertible ownership units. The Preferred Stock shall have no voting rights and shall pay no dividends; provided, however, that in the event Buyer is in default under the Note, Seller shall have the right to convert its Preferred Units into a nondilutable 2.5 percent equity position in Oxygen and such equity position shall have all the rights of Oxygen's common units (the "Common Units"). Upon Buyer's completion of the payment obligations under this Agreement and the Note, all of Seller's rights in the Preferred Stock shall be void and cancelled.

3.4 **Sales and Transfer Taxes and Fees**. All applicable sales, transfer, documentary, use, filing or other taxes and fees (except income taxes of Buyer) that may be due or payable as a result of the conveyance, assignment, transfer, or delivery of the Purchased Assets to be conveyed and transferred as provided herein whether levied on Seller or Buyer shall be borne by Seller. The Parties agree that Buyer shall not pay any such tax, but that all such taxes shall be paid by Seller, subject to its rights in good faith to contest the validity or amount thereof by proper proceedings at its sole expense.


Buyer

Purchase Agreement – AEM /O2 HR
Page 5 of 15

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, Seller represents and warrants to Buyer, on and as of the Closing Date, as follows:

**4.1** **Authority.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida. Seller has the requisite power and authority to sell the Purchased Assets as set forth herein and to enter into this Agreement and perform its obligations hereunder. This Agreement has been duly executed and delivered by the Seller and constitutes the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its respective terms.

**4.2** **Title of Assets; Leased Personal Property.** Seller has good and valid title to the Purchased Assets, as defined in Section 2.1, free and clear of all Adverse Claims except those related to the Assumed Liabilities, as defined in Section 2.2, and at the Closing will convey good and valid title to all of such Purchased Assets to Buyer, free and clear of any and all Adverse Claims.

**4.3** **Client Service Agreement Responsibilities.** Seller warrants that it will fulfill all of its current obligations and responsibilities with respect to benefits contributions, 401k contributions and net pay that arise under any of the Client Service Agreements prior to the Effective Date.

**4.4** **Employees.** Schedule 4.4 hereto sets forth a list of every internal employee of Seller as of the date hereof and their respective: (i) positions; and (ii) salary. Buyer shall be entitled to offer employment to any of such internal employees of Seller, on such terms and conditions as Buyer and such employees may agree. Seller shall waive and/or assign any "no compete" contract between it and any of such employees in favor of Buyer to effectuate the intentions of this Section 4.4.

**4.5** **Brokers.** No Person is or will become entitled to receive any brokerage or finder's fee, financial advisory fee or other similar payment in connection with the transactions contemplated by this Agreement by virtue of having been engaged by or acted on behalf of Seller.

**4.6** **Condition of Purchased Assets.** The Purchased Assets are being purchased by the Buyer in "AS IS WHERE IS WITH ALL FAULTS" condition with no representations or warranties of any kind whatsoever, except as specifically set forth herein.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER


Buyer


Seller

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller as follows:

5.1 **Organization and Qualification; Due Authorization and Approval.** Buyer is a duly organized limited liability company, validly existing and in good standing under the laws of the State of Illinois. Buyer is duly qualified and in good standing to do business in all jurisdictions in which such qualification is necessary. Buyer has full company power and authority to execute and deliver this Agreement and the other documents contemplated hereby to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the other documents contemplated hereby to which Buyer is a party and the performance and consummation of the transactions contemplated hereby and thereby by Buyer have been duly authorized by all necessary company actions on the part of Buyer. Upon execution and delivery by Buyer of each of this Agreement and the other documents contemplated hereby to which Buyer is a party and, subject to the due authorization, execution and delivery of such agreements by the other parties thereto, each of this Agreement and the other documents contemplated hereby will constitute the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

5.2 **No Violation; Consents and Approvals.** Neither the execution and delivery by Buyer of this Agreement or the other documents contemplated hereby to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof: (a) conflict with or result in a violation of (i) the certificate of formation or operating agreement of Buyer, or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation binding upon Buyer in any material respect; or (A) require consent under, violate, conflict with, or result in a breach of any of the material terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration, or result in the creation or imposition of any Adverse Claim on the assets of Buyer under, any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) require any license, Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Entity.

## ARTICLE VI
## CONDITIONS TO OBLIGATIONS OF SELLER

Seller's obligation to close under this Agreement shall be subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, unless waived by Seller as evidenced by its Closing hereunder.


Buyer

Purchase Agreement – AEM /O2 HR
Page 7 of 15

Seller

6.1 **Obligations Performed**. Buyer shall have performed and complied with all covenants, agreements and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

6.2 **Consents**. Buyer shall have obtained and delivered to Seller written consents of all persons or entities whose consent is required to consummate the transactions, including but not limited to the Parties' lenders and corporate or company approval bodies, contemplated hereby and all of such consents shall remain in full force and effect at and as of the Closing.

6.3 **Delivery of Closing Documents**. Buyer shall have delivered to Seller each of the Closing documents listed and set forth in Section 8.2 hereof together with any additional documents which Seller may reasonably request to effect the transactions contemplated herein.

6.4 **No Orders or Litigation**. No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order against Buyer or Seller (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting Buyer or Seller from consummating such transactions; provided, however, that Buyer shall use commercially reasonable efforts to have any such order or injunction vacated; and no suit, claim, cause of action, arbitration, mediation, investigation or other proceeding under which a third party or Governmental Entity is contesting, challenging or seeking to alter, enjoin or adversely affect the transfer of the Purchased Assets contemplated by this Agreement or any other transaction contemplated by this Agreement, will be pending or threatened against Buyer.

6.5 **Payment of Purchase Price**. Seller shall have received from Buyer each component of the Purchase Price due on the Closing Date as provided in Article III of this Agreement.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF BUYERS

The Buyer's obligation to close under this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, unless waived by Buyer as evidenced by its Closing hereunder.

7.1 **Obligations Performed**. Seller shall have performed and complied with all covenants, agreements and obligations under this Agreement, which are to be performed or complied with by it prior to or at the Closing.

7.2 **Consents**. Seller shall have obtained and delivered to Buyer written consents of all persons or entities whose consent is required to consummate the transactions, including but not limited to the Parties lenders and corporate or company approval bodies, contemplated hereby and all of such consents shall remain in full force and effect at and as of the Closing.



7.3     **Delivery of Closing Documents.** Seller shall have delivered to Buyer each of the Closing documents and instruments listed in <u>Section 8.3</u> hereof.

7.4     **No Orders or Litigation.** No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order against Seller or Buyer (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting Seller or Buyer from consummating such transactions; provided, however, that Seller shall use commercially reasonable efforts to have any such order or injunction vacated; and no suit, claim, cause of action, arbitration, mediation, investigation or other proceeding under which a third party or Governmental Entity is contesting, challenging or seeking to alter, enjoin or adversely affect the transfer of the Purchased Assets contemplated by this Agreement or any other transaction contemplated by this Agreement, will be pending or threatened against Seller.

7.5     **Purchased Assets.** Seller shall have transferred the Purchased Assets to Buyer, under terms and conditions acceptable to Buyer.

## ARTICLE VIII
## THE CLOSING

8.1     **Time and Place.** Subject to the terms and conditions set forth herein, the Closing of the transactions contemplated herein (the "Closing") shall take place no later than April 27, 2007 (the "Closing Date") (subject to extension by mutual agreement of the Parties) at 200 S. Orange Ave. Suite 2800, Orlando, FL 32801 at 10:00 a.m. or at such other time and place or at such other date, time and place as may be mutually agreed upon in writing by the Parties hereto.

8.2     **Deliveries by Seller at Closing.** At the Closing, Seller shall deliver to Buyer the following executed instruments, agreements and other items:

(a)     **Consents.** Written consents or approvals in the form and substance satisfactory to Buyer of each person or entity whose consent or approval is required to consummate the transactions contemplated herein.

(b)     **Title Certificates.** Delivery of the Purchased Assets.

(c)     **Additional Documents.** All such further instruments and documents as Buyer or Buyer's counsel may reasonably request for the more effective conveyance, assignment or transfer to the Buyer of any of the Purchased Assets and the transactions contemplated hereby.


Buyer


Seller

8.3 **Deliveries by Buyer at Closing.** At the Closing, Buyer will deliver to Seller the following:

(a) **Note.** The Note and Security Agreement executed by Buyer in favor of Seller.

(b) **Consents.** Written consents or approvals in the form and substance satisfactory to Seller of each person or entity whose consent or approval is required to consummate the transactions contemplated herein.

(c) **Additional Documents.** All such further instruments and documents as Sellers or Sellers' counsel may reasonably request for the more effective consummation of the transactions contemplated hereby.

## ARTICLE IX
## INDEMNIFICATION

9.1 **Seller Indemnity.** Seller agrees to indemnify, defend and hold harmless Buyer and its officers, directors, employees, agents, successors and permitted assigns (the "Buyer Group"), from and against any and all losses, liabilities, damages, costs and expenses (including court costs and reasonable attorneys' fees) (collectively, "Damages") incurred by any of the Buyer Group to the extent arising from or attributable to: (a) the breach of any representation or warranty of Seller contained in this Agreement; (b) any breach of any covenant or agreement of Seller contained in this Agreement; and (c) any Obligation (including without limitation, the payment of Taxes) relating to (i) Seller or the Excluded Assets and/or (ii) the Business and the Purchased Assets, which are attributable to the operations of the Business prior to the Closing Date.

9.2 **Buyer's Indemnity.** Buyer agrees to indemnify, defend and hold harmless Seller and each of its officers, directors, employees, agents, successors and permitted assigns (the "Seller Group"), from and against any and all losses, liabilities, damages, costs and expenses (including court costs and reasonable attorneys' fees) (collectively, "Damages") incurred by any of the Seller Group to the extent arising from or attributable to: (a) the breach of any representation or warranty of Buyer contained in this Agreement; (b) any breach of any covenant or agreement of Buyer contained in this Agreement; and (c) any Obligation (including without limitation, the payment of Taxes) relating to (i) Assumed Liabilities attributable to the operations of the Business after the Closing Date and/or (ii) the Purchased Assets attributable to the operations of the Business after the Closing Date.

9.3 **Claims Against Note.** Buyer may, but shall not be obligated to, deduct the amount of any Damages from the payments due under the Note or to reduce the principal thereof and recalculate the remaining payments due under the Note; provided, however, that Buyer shall receive and submit to Seller a final adjudication with regard to the Damages thereto.

**9.4 Survival.** All representations and warranties of any Party contained in this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, but shall be extinguished and be of no further force or effect eighteen (18) months after the Closing Date, except for representations and warranties related to Section 4.3.

**9.5 Deductible.** Except for indemnification due to a breach of Section 4.2 and/or Section 4.3, no indemnification shall be required to be made by the Seller under this Article IX with respect to any Damages until the aggregate amount exceeds Twenty Five Thousand Dollars ($25,000.00), and provided further that if the aggregate amount of losses exceeds such amount, indemnification shall be made only with respect to the aggregate amount of losses which exceeds such amount. For the avoidance of doubt, the Parties acknowledge and agree that the Twenty Five Thousand Dollar deductible shall be cumulative and not per occurrence.

**9.6 Procedure for Indemnification.**

(a) Promptly after receipt by an indemnified party of notice of the commencement of any proceeding against it by a third party, such indemnified party will, if a claim is to be made against any indemnifying party with respect to such action, give notice to the indemnifying party of the commencement of such claim.

(b) The indemnifying party will be entitled to participate in such proceeding and, to the extent that it wishes to assume the defense of such proceeding with counsel reasonably satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party for any fees of other counsel or any other expenses with respect to the defense of such proceeding subsequently incurred by the indemnified party in connection with the defense of such proceeding. In connection with any indemnification, the indemnified party will cooperate with all reasonable requests of the indemnifying party. A claim for indemnification for any matter not involving a third party claim may be asserted by prompt written notice to the party from whom indemnification is sought, subject to any limitations contained in this Article IX.

(c) The indemnifying party shall have 10 days to object to any notice of claim or loss made by an indemnified party. If the indemnifying party objects to such notice of claim or loss or fails to respond in such time period, the indemnified party may submit such claim or loss to a mediator for a determination of validity. The Parties agree to appoint a mediator who is a member of the Florida Circuit-Civil Mediation Society. Such mediator shall make a determination of the validity of such claim or loss. If such mediator determines such claim or loss to be valid, then the indemnified party shall be entitled to defense fees paid by the indemnifying party. The amount of the claim or loss shall be determined by mutual agreement of the Parties in writing, or a final non-appealable disposition of a court. The Parties covenant that they will participate, in good faith, in the mediation,



and that they will share equally in the costs and expenses thereof (which shall not include the costs or expenses incurred by a party for legal representation in connection with the mediation). The Parties hereby acknowledge and agree that any and all agreements reached during the course of mediation shall be binding upon both Parties. The provisions of this section may be enforced by any court of competent jurisdiction, and the Party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the Party against whom enforcement is ordered.

## ARTICLE X
## RESTRICTIVE COVENANTS

**10.1** **Restrictive Covenants.**

(a) **Nonsolicitation Covenant.** Until two (2) years after the Closing Date, Seller will not, directly or indirectly, solicit, or assist any Person who is or during such period becomes a customer, or, employee of, the Buyer, in any manner which interferes with such Person's relationship with the Buyer, or in an effort to obtain any such Person as a customer, or an employee of, any Person that conducts a business competitive with the Business.

(b) **Enforcement of Covenants.** The Parties hereto declare that it is impossible to measure in money the damages that will accrue to Buyer in the event that Seller breaches any of the covenants set forth in this Article X ("Restrictive Covenants"). In the event that Seller breaches any such Restrictive Covenant, Buyer shall be entitled to an injunction, a restraining order or such other equitable relief, including, but not limited to, specific performance restraining Seller from violating such Restrictive Covenant.

(c) **Acknowledgements.** Buyer is acquiring the Purchased Assets and paying the Purchase Price in anticipation of operating and expanding the Business. Seller is aware of Buyer's intentions and acknowledges that Buyer has stated that the Purchase Price Buyer is willing to pay would be substantially less without the Restrictive Covenants. Seller has agreed to in this Article X. Seller acknowledges that the Restrictive Covenants are reasonable and necessary to protect the Buyer's legitimate business interests.

(d) **Scope.** If any portion of any Restrictive Covenant or its application is construed to be invalid, illegal or unenforceable, then the remaining portions and their application shall not be affected thereby, and shall be enforceable without regard thereto. If any of the Restrictive Covenant is ever disputed or determined to be unenforceable because of its scope, duration, geographical area or other similar factor, then the court or other trier of fact making such determination shall modify, reduce or limit such scope, duration, area or other factor, and enforce such Restrictive Covenant to the extent it believes is lawful and appropriate.


Buyer

Purchase Agreement – AEM /O2 HR
Page 12 of 15

Seller

# ARTICLE XI
# MISCELLANEOUS

**11.1 Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made **(i)** the second business day after the date of mailing, if delivered by registered or certified mail, postage prepaid, return receipt requested, **(ii)** upon delivery, if sent by hand delivery, **(iii)** upon delivery, if sent by prepaid overnight carrier, with a record of receipt, or **(iv)** the next day after the date of dispatch, if sent by cable, telegram, facsimile or telecopy (with a copy simultaneously sent by registered or certified mail, postage prepaid, return receipt requested), to the Parties at the following addresses:

Notice to Seller shall be sent to:

Mirabilis HR
200 S. Orange Avenue; Suite 2800
Orlando, FL 32801
Attention: General Counsel

Notice to Purchaser shall be sent to:

O2 HR, LLC
5050 West Lemon Street
Tampa, Florida 33609
Attention: Thomas Bean

Any party hereto may change the address to which notice to it, or copies thereof, shall be addressed, by giving notice thereof to the other parties hereto in conformity with the foregoing.

**11.2 Binding Agreement; Assignment.** This Agreement and the right of the Parties hereunder shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns, heirs, estates and legal representatives. This Agreement shall not be assigned by either Party without the express written consent of the other Party.

**11.3 Entire Agreement; Amendment.** This Agreement and the Exhibits and Schedules attached hereto, and the documents delivered pursuant hereto, constitute the entire Agreement and understanding among the Parties hereto and supersede and revoke any prior agreement or understanding relating to the subject matter of this Agreement. No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding upon the other Party unless reduced to writing and signed by the Party against whom such change, amendment, termination or waiver is sought to be enforced.



**11.4 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**11.5 Expenses.** The Parties hereto will each pay their own attorneys and accountant fees, expenses and disbursements in connection with the negotiation and preparation of this Agreement and the other transactions contemplated hereby and all other costs and expenses incurred in performing and complying with all conditions to be performed under this Agreement and the other transactions contemplated hereby.

**11.6 Further Assurances.** Upon reasonable request from time to time, the Parties hereto will deliver and/or execute such further instruments as are necessary or appropriate to the consummation of the transactions contemplated by this Agreement.

**11.7 Construction.** Within this Agreement, the singular shall include the plural and the plural shall include the singular, and any gender shall include the other genders, all as the meaning in the context of this Agreement shall require. Nothing in this Agreement shall be construed against the draftsperson solely on the basis of drafting alone, given that both Parties fully reviewed and negotiated this Agreement with their counsel. The captions used in this Agreement are inserted for convenience only and shall not constitute a part hereof.

**11.8 Exhibits and Schedules.** All Exhibits and Schedules attached to this Agreement are by this reference incorporated herein and made an essential part hereof.

**11.9 Governing Law; Jurisdiction.** This Agreement shall be governed and regulated and the rights and liabilities of all Parties hereto shall be construed in accordance with the law of the State of Florida, without regard to conflicts or choice of laws rules.

**11.10 No Third-Party Beneficiaries.** This Agreement is not intended, and shall not be deemed, to confer upon or give any Person except the Parties hereto and their respective successors and assigns any remedy, claim, liability, reimbursement, cause of action or other right under or by reason of this Agreement.

**11.11 No Affect on Representations and Warranties.** No Closing or post-Closing adjustment or computation made pursuant to this Agreement or any amendment thereto with the consent or participation of the Buyer shall be deemed to waive or amend or otherwise affect any representation or warranty made by the Seller hereunder, even though such adjustment or computation covers the same subject matter as such representation or warranty.

**11.12 Time of Essence.** Time is of the essence for this Agreement.

[signatures are on the next page]

Buyer

Purchase Agreement – AEM /O2 HR
Page 14 of 15

Seller

IN WITNESS WHEREOF, the parties hereto, have executed this Agreement, as of the day and year first above written.

**SELLER:**

**AEM, INC. dba MIRABILIS HR,**
a Florida corporation

By: *(signature)* JODI QUAIMAN
Its: PRESIDENT

**BUYER:**

**O2 HR, LLC,**
an Illinois limited liability company

By: *(signature)* 1-1-15 THOMAS J. BEAN
Its: Manager

**WITH REGARD TO SECTION 3.3:**

**OXYGEN UNLIMITED, LLC,**
a Kentucky limited liability company

By: *(signature)* 1-1-13 THOMAS J. BEAN
Its: Manager